UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ANGELA L.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:20-cv-00481-SEB-DML |
| | ) |
| ANDREW M. SAUL, Commissioner of the Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

# **ORDER**

Plaintiff Angela L. ("Angela") has appealed the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her July 25, 2016, application for supplemental security income ("SSI"), and her July 26, 2016, application for disability insurance benefits ("DIB"), alleging a disability onset date of May 16, 2016. R. (Dkt. 10) at 17. The applications were initially denied on September 12, 2016, R. at 163; 167, and upon reconsideration on March 16, 2017. R. at 176; 179. On September 5, 2018, Angela amended her alleged onset date to August 1, 2017, based on her representation that she had been working for a family business up until its closure. R. at 274. The administrative law judge ("ALJ") conducted a hearing on October 1, 2018, R. at 67, resulting in a decision on January 24, 2019, that Angela was

---

[1] To protect the privacy interests of claimants for Social Security benefits, consistent with the recommendation of the Court Administration and Case Management Committee of the Administrative Office of the United States courts, the Southern District of Indiana has opted to use only the first name and last initial of non-governmental parties in its Social Security judicial review opinions.

1

not disabled and thus not entitled to receive DIB or SSI. R. at 14. The Appeals Council denied review on December 13, 2019, and the Commissioner's decision became final. R. at 1. On February 12, 2020, Angela timely filed this civil action seeking judicial review of the decision pursuant to 42 U.S.C. § 405(g). Dkt. 1. We note that jurisdiction is also proper pursuant to 42 U.S.C. § 1383(c).

For the reasons below, the decision is affirmed.

## **Background[2]**

The ALJ followed the five-step sequential evaluation set forth by the SSA, *see* 20 C.F.R. § 404.1520(a)(4)(i) to (v)[3], in concluding that Angela was not disabled. Specifically, the ALJ found as follows:

- At Step One, Angela had not engaged in substantial gainful activity[4] since the amended, alleged onset date of disability. R. at 20.

- At Step Two, she had the following severe impairments: "bilateral knee degenerative joint disease, lumbar degenerative disc disease, and history of malignant peritoneal mesothelioma status post surgery." *Id.* (citations omitted).

- At Step Three, she did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. R. at 22.

---

[2] The discussion of Angela's medical history and treatment includes sensitive and otherwise confidential medical information that has been thoroughly detailed in the ALJ's decision and the parties' respective briefs. To the extent possible, we detail here specific facts only as necessary to address the parties' arguments.

[3] The Code of Federal Regulations contains separate, parallel sections concerning DIB and SSI, which are identical in most respects. Generally, a verbatim section exists establishing the same legal point with both types of benefits. *See, e.g.*, 20 C.F.R. § 416.920(a)(4)(i)-(v). We will not usually reference the parallel section but will take care to detail any substantive differences that apply to the case.

[4] Substantial gainful activity is defined as work activity that is both substantial (*i.e.*, involves significant physical or mental activities) and gainful (*i.e.*, work that is usually done for pay or profit, whether or not a profit is realized). 20 C.F.R. § 404.1572(a).

- After Step Three but before Step Four, Angela had the residual functional capacity ("RFC") "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: no more than occasional stooping, crouching, and climbing of ramps and stairs; no kneeling, crawling, or climbing of ladders, ropes, or scaffolds; no use of foot controls with the bilateral lower extremities; no exposure to extreme heat, extreme cold, humidity, wetness, vibrations, or hazards, such as dangerous heights or machinery; only occasional exposure to dusts, fumes, odors, gases, and other pulmonary irritants; allow to alternate into the sitting position from the standing and/or walking positions every 30-45 minutes for 2-3 minutes while at the work station; and allow to alternate into the standing position from the sitting position every 30-45 minutes for 2-3 minutes while at the work station." *Id.*

- At Step Four, relying on the testimony of the vocational expert ("VE") and considering Angela's RFC, she was incapable of performing her past relevant work as a landscaping laborer. R. at 24-25.

- In the alternative, at Step Five, relying on the testimony of the VE and in light of Angela's age (54 years of age on the DLI), education (at least a high school graduate), and RFC, there were jobs that existed in significant numbers in the national economy that she could have performed in a representative occupation as an office machine operator. R. at 25-26.

### **Standard of Review**

Upon review of the Commissioner's decision,

> [w]e will uphold [it] if it applies the correct legal standard and is supported by substantial evidence. *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir. 2007)). A decision denying benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded. *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir. 2009). Our review is limited to the reasons articulated by the ALJ in her decision. *Larson v. Astrue,* 615 F.3d 744, 749 (7th Cir. 2010).

*Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). In determining whether the decision was properly supported, we neither reweigh the evidence nor assess the

credibility of witness, nor substitute our judgment for the Commissioner's. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).

## Analysis

Angela presents five issues for review: whether the ALJ's Step Five determination is unsupported by substantial evidence, because (1) the sit/stand option is inconsistent with light exertional work, or (2) there was a not a significant number of jobs available, and/or the ALJ erred in (3) concluding that Angela could sustain the standing and walking requirements of light exertional work, (4) finding that chronic obstructive pulmonary disease ("COPD") was not a severe impairment, and (5) failing to include mental limitations in the RFC finding. We address these issues in turn below:

### Sit/Stand Option

Angela contends that the occupational title that the ALJ found she could perform, that is, as an office machine operator, was classified as light exertional work by the VE, which means that it requires standing and walking for six hours in an eight-hour workday. Dkt. 13 at 16. She contends further that the ALJ's RFC assessment is inconsistent with her having the ability to maintain prolonged standing and walking required by light exertional work according to Social Security Ruling ("SSR") 83-12. Dkt. 13 at 16-17.

The ALJ found that Angela had the RFC "to perform light work as defined in 20 CFR 404.1567(b)" except, in relevant parts, the work mustn't include "use of foot controls with the bilateral lower extremities" and must "allow [her] to alternate into the sitting position from the standing and/or walking positions every 30-45 minutes for 2-3

4

minutes while at the work station; and allow [her] to alternate into the standing position from the sitting position every 30-45 minutes for 2-3 minutes while at the work station." R. at 22. The regulatory definition referenced by the ALJ explains that:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). SSR 83-10 (S.S.A. 1983), 1983 WL 31251, at *6, elaborates that:

> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time.

The limitation assessed by the ALJ concerning Angela's need to be able to alternate positions (the "sit/stand option") does not necessarily conflict with the requirement of the full range of light exertional work involving an ability to stand and walk for six hours in an eight-hour workday. In calculating specific time ranges in the most favorable light to reflect Angela's argument, if she were to spend three minutes sitting after every 30 minutes of standing or walking—without including any additional time to sit during regular breaks—approximately 44 minutes of sitting per eight-hour workday would be the extent of those required breaks ((3/33) x 480 (number of minutes in an eight-hour day) = 43.63). Those breaks for sitting would still leave more than seven

hours during which Angela could be working on her feet within the context of the sit/stand option.

Regarding whether a light exertional occupation could be performed with the sit/stand option, SSR 83-12 explains:

> 1. *Alternate Sitting and Standing*
>
> In some disability claims, the medical facts lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for a[ ]while before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and for the relatively few light jobs which are performed primarily in a seated position) or the prolonged standing or walking contemplated for most light work. (Persons who can adjust to any need to vary sitting and standing by doing so at breaks, lunch periods, etc., would still be able to perform a defined range of work.)
>
> There are some jobs in the national economy--typically professional and managerial ones--in which a person can sit or stand with a degree of choice. If an individual had such a job and is still capable of performing it, or is capable of transferr[i]ng work skills to such jobs, he or she would not be found disabled. However, most jobs have ongoing work processes which demand that a worker be in a certain place or posture for at least a certain length of time to accomplish a certain task. Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or stand at will. In cases of unusual limitation of ability to sit or stand, a [vocational specialist] should be consulted to clarify the implications for the occupational base.

(S.S.A. 1983), 1983 WL 31253, at *4. The ALJ did not determine that Angela needed to be able to alternate positions at will. The ALJ put to the VE a second, inclusive hypothetical—building on a first hypothetical—that accurately described the limitations that would ultimately comprise the RFC finding, including the specific sit/stand option. *See* R. at 93-95. The VE testified that an "office machine operator" occupation "could be

performed," but there were no other viable, representative occupational titles considering the combined limitations, as well as Angela's vocational profile including her work experience and limited "educational background." R. at 95-96.

The ALJ followed the SSA's guidance in SSR 83-12 by consulting a vocational specialist about the effect of the sit/stand option as well as Angela's other limitations. This case does not turn on whether Angela could perform the defined requirements of the full range of light exertional work. When a claimant is incapable of the full range of an exertional level, the ALJ must rely on "reasonable evidence" and "[a] vocational expert may be used by the [Commissioner] to assess whether there are a significant number of jobs in the national economy that the claimant can do." *Lee v. Sullivan*, 988 F.2d 789, 793 (7th Cir. 1993) (citing *Warmoth v. Bowen*, 798 F.2d 1109, 1112 (7th Cir. 1986) (per curiam); 20 C.F.R. § 404.1566(e)). The VE considered the reduced range of work that Angela could perform according to the ALJ's findings. The Seventh Circuit has held that "[t]he hypothetical question posed by the ALJ was proper because it reflected [Angela's] impairments to the extent that the ALJ found them supported by evidence in the record." *Ehrhart v. Sec'y of Health & Hum. Servs.*, 969 F.2d 534, 540 (7th Cir. 1992). The VE testified that there was a qualifying, light exertional occupational title.[5]

---

[5] We note that the occupational "DOT" code supplied by the VE, 207.685-014, R. at 95, corresponds with a "photocopying-machine operator" in the *Dictionary of Occupational Titles*. DICOT 207.685-014 (G.P.O.), 1991 WL 671745. The DOT explains that the occupation's "[p]hysical demand requirements are in excess of those for Sedentary Work. Even though the weight lifted may be only a negligible amount, a job should be rated Light Work: (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible." *Id*.

**Significant Number of Jobs**

Angela next contends that the availability of jobs for this specific occupational title does not meet the Commissioner's burden at Step Five. Dkt. 13 at 17-18. At Step Five, the burden shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000), *as amended* (Dec. 13, 2000) (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)).

The VE testified that there were "about 53, 200" office machine operator jobs available "in the nation." R. at 95.

The Social Security Act explains:

> An individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A). The SSA's relevant regulation tracks the statutory authority adding some elaboration:

> How we determine the existence of work. Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy." We will not deny you disability benefits on the basis of the

8

existence of these kinds of jobs. If work that you can do does not exist in the national economy, we will determine that you are disabled. However, if work that you can do does exist in the national economy, we will determine that you are not disabled.

20 C.F.R. § 404.1566(b). The regulation specifies that even a single occupation can satisfy the Commissioner's legal burden. *See Coleman v. Astrue*, 269 F. App'x 596, 602 (7th Cir. 2008) (applying harmless error to issues with VE testimony when the ALJ properly found that claimant could perform one occupation that existed in significant numbers in the national economy).

We have explained that "neither the Social Security Act nor the Commissioner's regulations or rulings provide any definition, standard, or formula for significance, or a threshold number for significance . . . ." *Schadenfroh v. Colvin*, 2014 WL 1260123, at *11 (S.D. Ind. Mar. 27, 2014), *adopting report and recommendation*. We also have rejected the "argument that when jobs numbers are expressed on a national basis only, they never provide substantial evidence for the conclusion that jobs exist 'in the national economy' in the 'region' where the claimant lives or in 'several regions' in the country, no matter the jobs' apparent ubiquity . . . ." *John R. v. Saul*, 2020 WL 6435031, at *5 (S.D. Ind. Oct. 14, 2020), *adopting report and recommendation sub nom.*, *Ritchie v. Saul*, 2020 WL 6411850 (S.D. Ind. Nov. 2, 2020). The Seventh Circuit has commented, albeit in passing, that the utility of the SSA citing local and state job figures "is unclear, since if there is a significant number of jobs that the applicant for benefits can perform anywhere in the United States [she] is deemed not disabled . . . ." *Alaura v. Colvin*, 797 F.3d 503, 507 (7th Cir. 2015) (citation omitted). We have observed that "it has been commonplace

9

for several years for vocational experts in Social Security disability cases to express their jobs numbers on a national basis only, a departure from VE testimony in earlier years (such as at the time of *Schadenfroh)* to express jobs numbers on a state *and* national basis." *John R.*, 2020 WL 6435031, at *5 (emphasis in original).

In *John C. v. Saul*, 2021 WL 794780, at *4-6 (C.D. Ill. Mar. 2, 2021) (collecting cases), the court detailed how the shift in custom made the application of past Seventh Circuit cases a practical challenge. The district court concluded that "[t]he Seventh Circuit has not affirmatively established the threshold for the number of jobs in the national economy that qualifies as significant." *Id*. (citing *Weatherbee v. Astrue*, 649 F.3d 565, 572 (7th Cir. 2011) (finding that the availability of 140,000 jobs nationally was "well above the threshold for significance" without identifying the threshold). The court also noted that an unpublished case, *Primm v. Saul*, 789 F. App'x 539, 546 (7th Cir. 2019), determined that 110,000 jobs in the nation was a significant number, but relied on *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (holding that 4,000 jobs in the Milwaukee area was significant), without "clarifying the difference between regional and national job numbers." *John C.*, 2021 WL 794780, at *5. Further, district courts within the circuit—applying national numbers—have found as many as 120,350 jobs to not meet the burden, and as few as 17,700 jobs to be significant. *Id*. (citing *Sally S. v. Berryhill*, 2019 WL 3335033, at *11 (N.D. Ind. Jul. 23, 2019), *compared with Dorothy B. v. Berryhill*, 2019 WL 2325998, at *7 (N.D. Ill. May 31, 2019)).

In *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012), the Ninth Circuit explained that it had "never set out a bright-line rule for what constitutes a 'significant

number' of jobs," but that 135 regional jobs and 1,680 national jobs fell short of the Commissioner's burden without deciding "the floor." *Id*. at 390.  The court considered the VE's testimony—during cross-examination by the claimant's representative—that she was not familiar with the area where the claimant lived, nor if the occupation in question could be found there.  *Id*.  Here, Angela's representative didn't avail herself of the opportunity to cross-examine the VE about her knowledge concerning the distribution of office machine operator jobs, either generally or specifically where Angela lived.  The Supreme Court has explained that "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  When discussing an ALJ's reliance on a vocational expert's opinion, the Court explained that "even without significant testing, a factfinder may conclude that testimony has sufficient indicia of reliability to support a conclusion . . . ."  *Id*. at 1157.  We can take judicial notice of the fact that an office machine operator or photocopying machine operator is the type of clerical occupation that is likely well-dispersed throughout several regions throughout the nation.  In Indianapolis, Indiana, where Angela resides, it's reasonable to assume that the occupation would be more concentrated than in rural parts of the state (or nation) that do not feature corporate headquarters, government, and other commercial centers.  Thus, we conclude that 53,200 national jobs is a significant number and the ALJ's Step Five determination is supported by substantial evidence.

**Standing and Walking**

Angela includes several arguments that challenge the ALJ's RFC finding. First, she asserts that she could not sustain the standing and walking requirements of light exertional work. Dkt. 13 at 18. She contends that the ALJ's conclusion is unsupported by substantial evidence that she got sufficient relief from injections in her left knee to allow her to do so. Dkt. 13 at 18-19.

No medical source cited here has assessed more restrictive limitations than the ALJ's RFC finding. The Seventh Circuit has explained that "[w]hen no doctor's opinion indicates greater limitations than those found by the ALJ, there is no error." *Dudley v. Berryhill*, 773 F. App'x 838, 843 (7th Cir. 2019) (citing *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004)).

On July 19, 2016, an MRI revealed a "[h]uge mass in the pelvis." R. at 473. Shortly thereafter, Angela reported fatigue. R. at 506. In September 2016, the mass was surgically resected. *See* R. at 741. The final pathology from the Mayo Clinic confirmed a uterine STUMP[6] and "well-differentiated mesothelioma involving some nodules on the bowel mesentery." *Id*. Five months post surgery, on February 28, 2017, a follow-up examination disclosed completely normal findings, including breath sounds, bowel sounds, musculoskeletal range of motion, mood, affect, behavior, judgment, thought content, and neurological signs. R. at 524. Angela reportedly appeared "well-developed and well-nourished." *Id*.

---

[6] STUMP is an acronym for "smooth muscle tumors of uncertain malignant potential." https://www.pathologyoutlines.com/topic/uterusSTUMP.html (last visited June 30, 2021).

Eighteen months later, on September 7, 2018, Angela's treating gynecologist, Tina Ayeni, M.D., filed out a "post cancer treatment medical source statement," but did not complete any portions assessing specific functional limitations. R. at 1152-55. Dr. Ayeni noted merely that Angela was "on surveillance and continually has complaints of fatigue on her [six-]month visits." R. at 1155.

Similarly, on September 14, 2018, a nurse practitioner associated with Angela's oncology treatment provider filled out a form but did not provide any information concerning functional limitations. R. at 1159-62. The nurse's notes explained that "[f]urther evaluations should be completed by her [primary care physician,] as we are only seeing her every 3-4 months." R. at 1162.

Without the support of a medical opinion, Angela relies here predominantly on her subjective statements about her symptoms. To establish that she couldn't stand and walk in a fashion that was consistent with the RFC finding, she cites her knee pain. This condition lacks credibility in our analysis, as it apparently did with the ALJ. Reviewing courts examine whether a credibility determination was reasoned and supported; it's only when an ALJ's decision "lacks any explanation or support that we will declare it to be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

The ALJ explained that, following Angela's surgery, she had "good results and only monitoring thereafter." R. at 24. Otherwise, her treatment predominantly consisted of injections for knee pain "with noted improvement in her symptoms." *Id*. The ALJ noted that Angela had reported "that she 'loves' the injections." *Id*. The ALJ concluded that Angela's "good response to treatment supports the adopted residual functional

13

capacity." *Id*. The ALJ appropriately considered inconsistencies between the severity of symptoms that Angela described to the SSA compared with when she was seeking treatment, her failure to regularly seek treatment for those symptoms, the level of treatment, and the effectiveness of treatment. *See e.g.*, *Sienkiewicz v. Barnhart*, 409 F.3d 798, 803-04 (7th Cir. 2005); *see also Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (noting the deference given to the administrative factfinder on judicial review, as well as the regulatory guidance instructing the ALJ to consider such evidence).

Angela contends that the record does not support a finding that she had "ongoing, prolonged relief that allowed her to sustain her full activity level for the entire time between injections." Dkt. 13 at 19. On December 15, 2016, she reported 70% relief for 21 days with "improve[d] standing and walking with each injection." R. at 800-01. On November 13, 2017, she reported "3 weeks of 80% relief." R. at 838. "She states [that] she is able to walk with much less pain for the first few days, but she states [that] her pain starts to increase with more activity over the course of the month." *Id*. "Patient states [that] she has noticed a significant improvement in her life after starting the knee injections. She states [that] she continues to experience pain but with the combination of the medication and the injections[,] she has been able to experience well[-]controlled pain." *Id*. On January 11, 2018, Angela reported "up to 3 weeks of 70% relief." R. at 842. "[S]he was able to clean her home, clean dishes and carry laundry, walking up and down stairs with less pain." *Id*. But she stated there was "a drastic difference once the injection start[ed] to decrease in efficacy about the 3rd week. Patient states once again she ha[d] to decrease her activity level due to the pain increasing." *Id*. On March 8,

2018, Angela reported "up to 4 weeks of 80%-90% relief." R. at 849. Again, she was able to clean her home, do the dishes, carry laundry, and go up and down stairs with less pain. *Id*.

While Angela never reported getting complete relief from her pain with the injections, she did report being significantly more active. The ALJ's analysis also discloses that Angela did not feel compelled to seek treatment for her knee issues beyond receiving these injections. Considering the evidence and the findings as a whole, we do not view the ALJ's credibility determination as patently wrong.

The record contains further evidence that Angela was capable of significant activities. On July 5, 2017, she went to the emergency room due to two days of "dizziness, generalized fatigue/weakness and brief/resolved chest pain." R. at 1072. She reported that she had "been working out in her yard over the past [s]everal days for 8 hours." *Id*. The diagnosis was heat exhaustion. R. at 1077. On June 21, 2018, she returned to the emergency room complaining of fatigue experienced over the past three days. R. at 1136. "She states that she has been working a lot more and has not been sleeping as well as she normally does." *Id*. Angela reported "that she may have over[-]exerted herself, explaining she has been out in the heat working in the yard." *Id*. She had "[n]o other concerns at [the] time." *Id*. The ALJ twice noted that Angela testified that she "tries 'to do things outside.'" R. at 20; 23. Angela's repeated attempts to "work" outside, including for multiple eight-hour days—limited only apparently by exposure to the summer heat—does not reveal an incapacity to perform light exertional work with a sit/stand option.

We repeat: the ALJ did not find Angela to have an unlimited ability to stand or walk involving stints of approximately six hours during an eight-hour workday. The ALJ's limitations were for 30-minute periods of being on her feet in a single stretch. The ALJ also imposed limitations on her exposure to extreme temperatures. We find no basis on which to conclude that these judgments by the ALJ were patently wrong.

### COPD

Angela's next objection is based on the ALJ's determination that her COPD was not a severe impairment. She argues that that conclusion is unsupported by substantial evidence because the ALJ did not "consider the exacerbating effects of COPD in the RFC" or explain how she "would be able to sustain standing and/or walking for six hours in an eight-hour workday with her COPD." Dkt. 13 at 19-20.

The ALJ included in her opinion that Angela had been diagnosed with COPD as well as several other listed impairments. R. at 20. The ALJ explained that there was "no evidence that any of these impairments has caused more than minimal limitation in the ability to perform basic work activities or require greater limits than those adopted below. Thus, said impairments are non-severe." *Id*.

The Seventh Circuit has ruled that "[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluation process." *Castile*, 617 F.3d at 926–27 (citing 20 C.F.R. § 404.1523; *see Golembiewski v. Barnhart,* 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [appellant's] impairments was 'severe,' the ALJ needed to consider the *aggregate* effect of the entire constellation of ailments—including those impairments that in

16

isolation are not severe.")). "Therefore, the step two determination of severity is 'merely a threshold requirement.'" *Castile*, 617 F.3d at 927 (quoting *Hickman v. Apfel,* 187 F.3d 683, 688 (7th Cir. 1999)). The ALJ found at least one severe impairment and assessed an RFC. Accordingly, the severity determination concerning any single impairment is not material, so long as the RFC accounts for any supported limitations. Again, no medical source assessed any greater limitations than the ALJ. Angela had testified that she had COPD. R. at 83. She explained, "I can't do stairs or long distance now." *Id.*

On November 16, 2017, during a medical examination, Angela's breath sounds were normal. R. at 1193. On June 14, 2018, breath sounds were again normal. R. at 1177. On September 12, 2018, Angela reported to her primary care physician that she was frequently using an inhaler, had a productive cough, and shortness of breath with exertion and at night. R. at 1163. However, she also reported having recently "test[ed] positive to multiple allergens" and being an "every[]day smoker." *Id*. On examination, she had rhonchi, but oxygen saturation was 98%. R. at 1163-64. Spirometry testing showed that her FEV1 was 78% of the predicted level and increased to 85% after using a bronchodilator. R. at 1169. She was advised to quit smoking. R. at 1163. On September 13, 2018, Angela reported to her oncologist that she was "on Chantix and trying to quit smoking." R. at 1241. The record does not contain any further objective testing, subjective complaints, relevant treatment, her response to treatment, or the success of her efforts to quit smoking.

Based on this limited record, we find no basis to conclude that the ALJ erred. The ALJ is required to credit the limitations established through subjective statements only to

17

the extent she finds them credible. *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). The ALJ's limitations as to the amount of time that Angela could stand or walk at one time as well as her stair climbing and exposure to pulmonary irritants were sufficiently based in the record, and do not require anything further.

**Mental Impairments**

Angela's final contention is that the ALJ failed to account for her non-severe mental impairments in the RFC. Dkt. 13 at 20-21. She asserts that she reported having lost her job because of an inability to get along with others. Dkt. 13 at 21. She also asserts that the ALJ "overstated" her babysitting responsibilities in caring for her granddaughter based on her testimony, because she only performed this task once for "forty minutes." *Id*.

No medical source cited in the record before us has assessed any mental limitations on Angela's activities. In the course of the agency's reconsideration, the state psychological consultant reviewed the findings of a recent mental status examination as well as Angela's reported activities of daily living. R. at 149. The psychologist found her to suffer only mild mental limitations. *Id*. The ALJ explained that this opinion was "given great weight, as it is consistent with the record as a whole, particularly the lack of formal mental health treatment during the relevant period." R. at 24. The ALJ further explained that Angela had not indicated in paperwork submitted to the SSA that getting along with others was an area of functional impairment. R. at 21. On December 27, 2016, Angela didn't select "getting along with others" as affected by her conditions. R. at 309. She did report that she had lost her job in the past because of problems getting

along with others, but she distinguished, however, her ability to get along with authority figures, like "bosses," as being "ok." R. at 314.

No specific mental limitations have been identified that were omitted from the RFC; rather, Angela merely mentions the fact that she has had some issues with getting along with others, mild concentration problems, and general memory problems. *See* Dkt. 13 at 20-21. It is incumbent on an appellant to develop an alleged/omission by identifying a specific limitation that was both supported and neglected. *Jozefyk v. Berryhill*, 923 F.3d 492, 497-98 (7th Cir. 2019). The ALJ's Step Five determination relied on an unskilled[7] occupation. *See* R. at 25 (office machine operator is "SVP-2"). The VE also opined that based on Angela's educational background she could perform the occupation within the context of the RFC. In this appeal, Angela has failed to demonstrate that further limitations, based on any mental impairments or deficiencies, were necessary.

---

[7] The regulations explain that to determine the skill level required by work in the national economy, the SSA classifies jobs—using the same terms and definitions used by the DOT—as unskilled, semiskilled, or skilled. 20 C.F.R. § 404.1568. "The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2 . . . ." SSR 00-4P (S.S.A. Dec. 4, 2000), 2000 WL 1898704, at *3.

## **Conclusion and Order**

For the reasons explained above, the Commissioner's decision is AFFIRMED.

Final judgment shall issue by separate order. Fed. R. Civ. P. 58(a).

   IT IS SO ORDERED.


Date: 7/7/2021

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Lu Han
SOCIAL SECURITY ADMINISTRATION
lu.han@ssa.gov

Jonelle L. Redelman
REDELMAN LAW LLC
jonelle@redelmanlaw.com

Julian Clifford Wierenga
UNITED STATES ATTORNEY'S OFFICE (Indianapolis)
julian.wierenga@usdoj.gov